Larry G. DUNN, Appellant,

v.

Angela Irene DUNN, Appellee.

No. S–7589.

Supreme Court of Alaska.

Jan. 16, 1998.

OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Larry Dunn appeals the superior court's decisions calculating his imputed income, adding dividends earned in his Individual Retirement Account (IRA) to his income to calculate child support, and finding that he owed Angela Dunn $13,000 to compensate her for her portion of a van and for house improvements.

We affirm.

## II. FACTS AND PROCEEDINGS

Angela and Larry Dunn were married in Valdez in December 1992. Larry was an electrician, earning $46,000 per year. They kept their separate bank accounts, and Larry added Angela's name to his checking account. They also started a joint savings account. At the time they married, Larry was building a house in Valdez. Angela and Larry moved into that house in May 1993. Larry retired in May, but continued to work on the house. Using his savings, Larry bought a 1993 van for family use, and put its title in his name. Angela frequently drove it to work. Their son, Glen, was born in July 1993.

In February 1994 Larry had an operation on his right shoulder to correct his inability to raise his arm. The surgery was successful, but he was still unable to lift heavy objects overhead or do repetitive overhead work for more than brief periods.

The Dunns sold the Valdez house and moved to Wasilla in March 1994. With the proceeds of the house sale, Larry bought land in Wasilla for the purpose of building another house. Angela moved out of the Wasilla home in August 1994 and filed for divorce.

Trial was held in September 1995 on custody, child support, and property division issues. In the property division, Angela received $16,000, representing carpeting and furnishings in the Valdez house, half the value of the van, and other property sold during the marriage. Larry had to pay the guardian *ad litem*'s fees plus $3,000 for Angela's attorney's fees. Angela received

Kenneth C. Kirk, Anchorage, for Appellant.

David A. Golter, Tull & Associates, Palmer, for Appellee.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

custody of Glen and monthly child support of $557. The parties were divorced in December 1995.

In January 1996 Larry filed a motion for reconsideration or rehearing, supported by a physician's statements concerning his shoulder condition. The superior court denied Larry's motion. Larry appeals.

## III. DISCUSSION

### A. Child Support

#### 1. Larry's potential income

Larry argues that the court erred in estimating Larry's potential income when calculating child support. The trial court's determination of Larry's imputed income is a factual finding which we will review under the "clearly erroneous" standard. See R.F. v. S.S., 928 P.2d 1194, 1196 n. 2 (Alaska 1996). A finding is clearly erroneous if it leaves us with a "definite and firm conviction on the entire record that a mistake has been made." Id.

Larry contends that because of his shoulder injury, he will be unable to earn the $30,000 per year that the trial court imputed to him as income. Larry claims that the trial evidence proved his disability, but was inadequate to support the court's determination. He also argues that the superior court did not adequately explain its imputed income findings. Larry asserts that Angela's opposition to reconsideration provided no evidence refuting the doctor's statements accompanying Larry's motion.

Angela contends that the superior court properly explained its decision. She argues that Larry did not carry his burden of convincing the court of his limited earning capacity, and that Larry could not properly present new evidence to the court when he moved for reconsideration.

The commentary to Alaska Civil Rule 90.3 states that the trial court may determine an obligor parent's potential income when calculating child support if the parent is voluntarily unemployed or underemployed. Alaska R. Civ. P. 90.3 cmt. III.C.[1] The trial court determines the potential income considering the parent's work history, qualifications, and job opportunities. Id.

When determining the potential income of the obligor parent, the trial court must also balance the needs of the dependent children against the needs of the obligor for a career change. See Nass v. Seaton, 904 P.2d 412, 418 (Alaska 1995); Kowalski v. Kowalski, 806 P.2d 1368, 1371 (Alaska 1991) (no relief from a child support obligation except under the most extreme circumstances (citing Houger v. Houger, 449 P.2d 766, 770 (Alaska 1969))). "A noncustodial parent who voluntarily reduces his or her income should not automatically receive a corresponding reduction in his or her child support obligation." Nass, 904 P.2d at 418 (citing Pattee v. Pattee, 744 P.2d 658, 662 (Alaska 1987)).

In Kowalski, for instance, we found that the trial court did not abuse its discretion in assessing the obligor's earning capacity based on the finding that the obligor was voluntarily unemployed. 806 P.2d at 1372. We recognized that the noncustodial parent had the burden of establishing his earning capacity. Id. However, in Nass, we remanded because the trial court had not entered sufficiently detailed findings of fact in determining the obligor's potential income after finding that the obligor was voluntarily underemployed. 904 P.2d at 418–19. We remanded so the trial court could make findings "which disclose its methodology, as well as the factual basis, for its determination of the appropriate imputed potential income." Id. at 419; cf. Adrian v. Adrian, 838 P.2d 808, 812 (Alaska 1992) (holding that trial court failed to provide raw numbers for child support calculation and may have relied too heavily on attorney's proposed findings and conclusions of law).

1. The commentary to Civil Rule 90.3 provides: The court may calculate child support based on a determination of the potential income of a parent who voluntarily is unemployed or underemployed. . . . Potential income will be based upon the parent's work history, qualifications and job opportunities. The court also may impute potential income for non-income or low income producing assets. Alaska R. Civ. P. 90.3 cmt. III.C.

The superior court found that Larry's imputed income for child support purposes should be $30,000. The court explained its reasoning:

I think here in these facts I should find that Mr. Dunn is underemployed, significantly underemployed if he chooses not to obtain any employment. . . .

So I'm going to find, I'm going to assess child support against Mr. Dunn as follows:

I'm going to count as income . . . a $30,000 a year income for being employed with his skill level at least a significant portion of the time.

In other words, the Court's not saying he has to go out and get a $45,000 a year job and add that to everything else he has. . . . The Court's saying I'm going to assume he can do two-thirds of that. . . .

He's clearly sitting on significant investments that really do not produce any money, and investments could produce money. He's living in a $195,000 house that he basically owns free and clear. And that's certainly something he has the choice to do if he's completely on his own. But he's brought a child into the world. . . . [B]ecause he has the son I think he doesn't have the same free choice to do that as he would if he had no son.

■ The court's analysis of Larry's unemployment is reasonable because Larry was in his early fifties, had voluntarily retired, and was building houses. Larry testified that recurring shoulder pain limited his job opportunities,[2] but the evidence also established that he was able to continue building his house.

At the time of the guardian *ad litem*'s report, Angela was unemployed and living with Glen and a teenage son from a prior marriage. The evidence was adequate to demonstrate that the needs of the child were substantial, and that there was no substantial justification for excusing the noncustodial parent from employment. Imputing income to the noncustodial parent was therefore warranted.

The superior court decided that Larry's potential income would be two-thirds of his previous income of $45,000. Given the evidence, the calculation of imputed income was not arbitrary. Larry provided no quantitative trial evidence about the extent of his impairment or the income he could expect if he entered the job market. Based on the trial evidence, it was not clear error to find Larry's potential income was $30,000.

### 2. *Including IRA dividends in Larry's income*

■ Larry argues that the superior court erred in treating dividends earned in Larry's IRA as income when it calculated child support. This contention raises a question of law which we review applying our independent judgment. *Wright v. Wright,* 904 P.2d 403, 408 n. 7 (Alaska 1995). We adopt the rule of law that is most persuasive in light of precedent, reason, and policy. *Id.*

Larry asserts that earnings in an IRA are not mentioned in the commentary to Rule 90.3 and that such earnings can be considered a withdrawal from a pension or profit-sharing plan, which is exempted under certain circumstances. *See* Alaska R. Civ. P. 90.3 cmt. III.A. Larry also argues that IRA earnings would not be available to support a child in an intact family because a large tax penalty would be incurred if the funds were withdrawn early. He theorizes that including earnings in an IRA would unreasonably burden courts calculating child support.

Angela claims that Rule 90.3 and its commentary do not prevent a court from including IRA earnings in a child support calculation. She denies that the tax consequences upon withdrawal would matter.

■ We have not considered whether earnings in an IRA should be considered income to a noncustodial parent for child

---

**2.** Because it is not appropriate to present new evidence on a motion for reconsideration, we will not consider the evidence Larry submitted with his reconsideration motion. *See Neal & Co. v. Association of Village Council Presidents Reg'l Hous. Auth.,* 895 P.2d 497, 506 (Alaska 1995) ("We refuse to allow a motion for reconsideration to be used as a means to seek an extension of time for the presentation of additional evidence on the merits of the claim."); Alaska R. Civ. P. 77(k)(1).

support purposes. Other jurisdictions, however, have ruled on the issue, finding that interest earned in an IRA can be considered as income when calculating child support. *See, e.g., In re Marriage of Tessmer,* 903 P.2d 1194, 1196 (Colo.App.1995) (holding that gross income can include interest or dividends accruing to father's IRA); *In re Pedersen,* 261 Mont. 284, 862 P.2d 411, 414 (1993) (holding that court can attribute income to assets, including those in an IRA); *Rapp v. Rapp,* 89 Ohio App.3d 85, 623 N.E.2d 624, 626 (1993) (stating that "annual interest from an obligor's IRA or employee savings plan could be considered as gross income when determining child support").

The commentary to Rule 90.3 lists numerous benefits that courts should treat as income when calculating child support. Alaska R. Civ. P. 90.3 cmt. III.A. The commentary does not list earnings in an IRA, but the list is non-exclusive. *Id.* Dividends in an IRA are very similar to several of the benefits on the list, such as interest and dividends, income from trusts, income from life insurance or endowment contracts, or income from interest in an estate. *Id.* Larry's IRA earnings for the first months of 1995 were mostly in the form of dividends.

 The tax treatment of each of these benefits varies, but an obligor can account for these differences when listing deductions on the child support guidelines affidavit. We are unable to determine whether Larry's child support guidelines affidavit incorporated any tax consequences of IRA withdrawals. Larry's trial counsel submitted the affidavit, and the superior court relied on it. Because Larry has not objected to these final calculations, he has waived any argument that the court failed to deduct IRA withdrawal penalties.

Larry also claims that the purpose of the IRA—retirement savings—distinguishes it from other types of investments. This argument is unconvincing, because many investments have a savings purpose, and may be made at least in part in anticipation of retirement.

Larry argues that IRA earnings should be considered to be pension or profit-sharing benefits. He quotes the commentary to Rule 90.3, which states that withdrawals from pension or profit-sharing plans "will not be counted as income to the extent that the proceeds have already been counted as income for the purposes of calculating child support." Alaska R. Civ. P. 90.3 cmt. III.A. Dividends accruing in an IRA, however, have not been counted as income to the noncustodial parent. Additionally, proof of the dividends is not usually difficult, and does not unduly burden the superior court. The superior court calculated the dividends accruing in Larry's IRA from his IRA financial statement and the figures his attorney supplied.

The superior court did not err in including dividends earned in Larry's IRA as income for purposes of calculating child support.

B. *Property Division*

1. *Carpet for the Valdez house*

 Larry argues that the superior court erred in finding that Angela had paid for carpeting for the Valdez house. He asserts that Angela did not establish by a preponderance of the evidence that she gave $6,000 to Larry to pay for carpeting for the Valdez house. The trial court's factual findings on this issue "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Horton v. Hansen,* 722 P.2d 211, 215 n. 7 (Alaska 1986).

Larry argues that Angela's evidence is particularly weak because she introduced no bank statements. He also claims that because Angela was never involved in building the house, it would have been inconsistent for her to give him money for the house.

The evidence on this dispute is not crystal clear. The superior court based its finding on the parties' testimony and on a bank statement from their joint checking account showing a deposit of $6,000 in May 1993. It is irrelevant to speculate about what might have been proven had excluded exhibits, such as other bank statements, been admitted into evidence. The record is also unclear about whether Angela would have contributed her

own money to purchase materials for the Valdez house.

Angela testified that she remembered giving Larry $6,000 out of her separate account to pay for carpeting for the Valdez house. On cross-examination, Angela was unsure about the form of her payment to Larry or whether Larry had deposited the amount.

Larry also testified about the alleged gift from Angela, and testified that she had not put any money into the Valdez house. He admitted, however, that he did not know where the $6,000 deposit had come from, and he conceded that the money could have come from Angela's account.

Because Larry did not directly contradict Angela's testimony that she gave the money to Larry, the trial court's finding that Angela gave Larry $6,000 for carpeting is not clearly erroneous, even though the other evidence was equivocal.

### 2. The van

 Larry argues that the superior court erred in awarding Angela credit for half the value of the van under a rescission theory of property division. He asserts that treating the van as marital property was inconsistent with applying the rescission theory of *Rose v. Rose*, 755 P.2d 1121 (Alaska 1988). We will review the trial court's allocation of property under the abuse of discretion standard, reversing the trial court's determination only if the allocation is clearly unjust. *Jones v. Jones*, 835 P.2d 1173, 1175 (Alaska 1992). However, "[w]hether the trial court applied the correct legal standard in exercising its broad distributive discretion is a separate legal issue which we review *de novo*." *Compton v. Compton*, 902 P.2d 805, 808 n. 2 (Alaska 1995).

Larry claims that the van should be considered his separate property, because he bought the van with his savings. He further asserts that even applying the equitable distribution principle, the court should have awarded the van to him as separate property, on the theory the van was never converted to marital property because Angela never maintained it or had title to it.

Angela replies that the superior court's division of the van should be reversed only if the decision is unjust. She asserts that because she sold her car, quit her job, and drove the van more often than Larry, the division of the van was not unjust. She also reasons that the court allocated $7,000 to her because it did not grant her reorientation alimony or give her a portion of either of the houses Larry built.

 Separate property becomes marital only upon a showing that the parties intended to treat the property as marital. *Chotiner v. Chotiner*, 829 P.2d 829, 832 (Alaska 1992). We held in *Rose* that for marriages of short duration in which assets have not been commingled, "the trial court may, without abusing its discretion, treat the property division as an action in the nature of rescission, aimed at placing the parties in, as closely as possible, the financial position they would have occupied had no marriage taken place." 755 P.2d at 1125. We have refused to apply *Rose* when the parties have commingled assets. *See Cox v. Cox*, 882 P.2d 909, 914 (Alaska 1994); *Bell v. Bell*, 794 P.2d 97, 102 (Alaska 1990).

The circumstances of the Dunns' divorce allow for a *Rose* rescission. Their marriage was short (twenty months), and, except for the van, they did not commingle their assets. The superior court divided most of the property using a rescission theory, giving the parties their separate bank accounts, and giving Larry his retirement savings and the Wasilla house. The court, however, divided the van using equitable distribution principles. *See* AS 25.24.160(4); *Merrill v. Merrill*, 368 P.2d 546, 547 (Alaska 1962). The court found that

> the Astro [van] was basically donated to the marriage and should be considered marital property subject to an equitable division, that ... there was clearly commingling in buying that Astro.... He wanted her to sell her car. He basically bought the Astro. He may have bought it out of his premarital funds, but it was used as the family car. In fact, as the testimony told it, she, Angela, was the primary driver of the Astro for a while.... That was the family vehicle. The money that

came from selling her car was swallowed up and I think the Astro should be subject to an equitable division on that ground.

The court also justified its treatment of the van by noting that it did not divide any of Larry's earnings from building the houses and did not award reorientation alimony.

Under these circumstances, the superior court did not abuse its discretion by treating the van as a marital asset. That treatment was adequately supported with evidence that Angela sold her car on Larry's advice, that the van was bought during the marriage for family use, and that Angela drove the van most of the time. Although Larry bought the van with his separate savings, evidence that the parties intended the van to be a family vehicle warranted the finding that the van was marital property. The superior court did not err in awarding Angela half the value of the van.

## IV. CONCLUSION

We AFFIRM the judgment of the superior court.